KAREN P. HEWITT
United States Attorney
JOHN R. KRAEMER
Assistant U.S. Attorney
California State Bar No. 110756
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-2934
Email: john.kraemer@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. FRANK BERTOLINO III (1), DOMINICK BERTOLINO (2), MICHAEL MASSOOD KACHI (3), Defendants. | Criminal Case No. 08CR2107-W Date: August 18, 2008 Time: 2:00 p.m. GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT DOMINICK BERTOLINO'S MOTION FOR DISCOVERY TOGETHER WITH GOVERNMENT'S REQUEST FOR RECIPROCAL DISCOVERY |

The plaintiff, UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, and JOHN R. KRAEMER, Assistant United States Attorney, hereby files its response and opposition to defendant's pre-trial motions, together with the Government's request for reciprocal discovery.

**I**

**STATEMENT OF FACTS**

**A. CHARGES AND CASE STATUS**

On June 24, 2008, a federal grand jury returned a 14-count Indictment charging Frank Bertolino III, Dominick Bertolino, and Michael Massood Katchi with Conspiracy to Distribute Cocaine, in violation of Title 21, United States Code, Sections 846 and 841(a)(1) (all defendants in count 1); Distribution of Cocaine and Aiding and Abetting, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2 (defendant Frank Bertolino in counts 2 through

1 12 and defendant Dominick Bertolino in Count 7), Possession of Cocaine with Intent to Distribute and Aiding and Abetting, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2 (all defendants in count 13); and Distribution of Cocaine and Aiding and Abetting, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2 (defendants Frank Bertolino III and Dominick Bertolino in count 14). In addition, the Indictment contained a Forfeiture Allegation as to all three defendants pursuant to Title 21, United States Code, Section 853(a)(1).

The case is currently set for a motions hearing on August 18, 2008 at 2:00 p.m.

As of this writing, defendant Dominick Bertolino is the only defendant to file motions (for discovery).

**B.     THE OFFENSE**

**1.     Undercover Buys from the Bertolinos August 24, 2007 to April 3, 2008**

On August 24, 2007, El Cajon Police Department (hereafter "ECPD") Detective Darren Forster directed a confidential informant (hereafter "CI") to call defendant Frank Bertolino III (hereafter "Frank") and order a half ounce of cocaine. During a recorded conversation, Frank agreed to sell the CI the half ounce. Frank arrived at a 7-Eleven parking located at 1498 Jamacha Road, El Cajon, California (hereafter "7-Eleven") driving an Acura Integra. The CI went to the Acura and paid $300 to Frank for the half ounce of cocaine, as well as an additional $30 for a past debt. Frank never got out of the Acura and the deal, which was recorded and photographed, took 10 seconds. The CI turned over 13.6 grams of cocaine (net weight) to ECPD Detective Royal Bates (hereafter "Bates").

On August 29, 2007, Forster told the CI to call Frank and say that a friend "Jason" (i.e., undercover detective Bates) could purchase a half ounce of cocaine from him. In a recorded call, the CI asked Frank if his friend "Jason" could pick up a half ounce. Frank agreed to sell the half ounce to "Jason" at the same 7-Eleven. At approximately 3:47 p.m., Frank arrived at the 7-Eleven driving a Cadillac CTS with a European Coach dealership paper plate on the back of the car. Frank got out of his vehicle and met Bates. Frank gave Bates 13.8 grams of cocaine (net weight) in exchange for $300.

On September 7, 2007, during a recorded telephone call, Frank agreed to meet with Bates at the 7-Eleven to sell one ounce of cocaine. Frank arrived at the 7-Eleven parking lot driving a Cadillac Escalade. Bates walked over to the passenger side of Frank's vehicle, opened the passenger door and saw a bag of white powdery substance sitting on the center console. During a recorded conversation, Frank gave Bates 27.8 grams (net weight) of cocaine in exchange for $600.

On September 12, 2007, during a recorded telephone conversation, Frank agreed to meet with Bates at the 7-Eleven parking lot to sell Bates cocaine. At approximately 2:56 p.m., Frank arrived at the 7-Eleven parking lot driving a black Range Rover. Bates approached the passenger side of Frank's vehicle. Frank rolled down his window, reached into his pocket, pulled out a ziplock baggie containing approximately 14.1 grams (net weight) of cocaine, and handed it to Bates in exchange for $300.

On October 3, 2007, during a telephone conversation, Frank agreed to meet Bates at the 7-Eleven parking lot for the purpose of selling cocaine to Bates. At approximately 3:36 p.m., Frank arrived at the 7-Eleven driving a silver-colored, 3 series BMW convertible. A young female (approximately 18 to 23 years of age) was in the passenger seat. Frank parked the BMW and got out of his vehicle as Bates got out of his vehicle. Frank handed Bates a baggie containing approximately 28.1 grams (net weight) of cocaine in exchange for $600.

On October 18, 2007, during a telephone conversation, Frank agreed to provide Bates with cocaine at the 7-Eleven parking lot. While Bates was en route to the 7-Eleven, Frank called Bates and said that his brother would be meeting with Bates. Dominick Bertolino (hereafter "Dominick") thereafter arrived at the 7-Eleven parking lot as the passenger in a black BMW 745i Series vehicle driven by an unidentified white male. Bates approached the passenger side of the BMW and gave Dominick $600. Dominick in turn handed Bates a plastic baggie containing approximately 27.5 grams (net weight) of cocaine. During a telephone call later in the day, Frank told Bates that the person who accompanied Dominick was a bodyguard.

On November 9, 2007, during a telephone conversation, Frank agreed to meet Bates at the 7-Eleven parking lot. At approximately 2:05 p.m., Frank arrived at the 7-Eleven parking lot driving a white convertible BMW 645ci. Bates approached the passenger side of the BMW and saw Frank

holding a ziplock baggie containing a white substance. Frank handed Bates the baggie, which contained approximately 55.9 grams (net weight) of cocaine in exchange for $1,200.

On December 4, 2007, during a telephone conversation, Frank agreed to meet Bates at the 7-Eleven parking lot for the purpose of delivering cocaine to Bates. At approximately 2:15 p.m., Frank arrived at the 7-Eleven parking lot driving a black Range Rover. Bates walked over to the passenger side of the Range Rover, opened the door and got in. At that time, Frank handed Bates a plastic baggie containing approximately 83.7 grams (net weight) of cocaine in exchange for $1,800.

On January 9, 2008, Bates called Frank and told him he needed two ounces of cocaine and that he, Bates, was en route to the 7-Eleven parking lot. Thereafter, Frank arrived at the 7-Eleven parking lot driving a black Range Rover. Bates got into the left rear passenger seat of the Range Rover behind Frank. Another male was in the right front passenger seat. Frank then delivered a ziplock baggie containing approximately 55.2 grams of cocaine (net weight) to Bates in exchange for $1,200.

On February 1, 2008, Bates called Frank and told him he needed two ounces of cocaine. At 4:01 p.m., Frank arrived at the 7-Eleven parking lot as a passenger in a Hertz rental white Hummer H3 driven by a blonde white female. Frank got out of the vehicle and gave Bates two clear plastic baggies containing approximately 55.2 grams (net weight) of cocaine in exchange for $1,200.

On April 3, 2008, Bates purchased approximately three ounces of what tested presumptively positive as cocaine from Frank at the 7-Eleven parking lot. Bates contacted Frank who was in a white Range Rover SUV bearing European Coach paper plates, driven by a white female adult later identified as Frank's girlfriend.

**2.    May 15, 2008:  Arrest of Michael Massood Kachi**

On May 15, 2008, at approximately 7:00 p.m., surveillance was conducted at the Bertolino residence in El Cajon, California. At about 7:30 p.m., ECPD Sargent Michael Hook saw a white Range Rover bearing European Coach paper plates arrive at the residence. Agents saw a white male go into the residence.

At approximately 7:45 p.m., a white Acura Integra owned by Dominick Bertolino arrived at 1140 Monterey Drive. Agents saw a white male thereafter go into the residence.

1   At approximately 8:17 p.m., Sargent Hook saw a gray Mazda bearing California plates leave the
2   Bertolino residence. Three minutes later, Detective Forster saw the gray Mazda meet up with a
3   Ford Ranger pickup truck at the RiteAid store located at Avocado and Chase.

4   At about 8:23 p.m., ECPD Officers Doyle and Wining stopped the Ford Ranger on the on-ramp
5   to Highway 67 north. The three occupants of the Ford Ranger were identified. A fourth waiver search
6   of the vehicle was conducted but nothing illegal was found.

7   At about 9:05 p.m., Sargent Hook saw the white Range Rover leave the Bertolino residence and
8   travel to the Von's parking lot at Avocado and Chase. After pulling into the lot, the white Range Rover
9   made a couple of laps around the parking lot and appeared to be conducting counter-surveillance.

10  At about 9:28 p.m., Detective Wooddell saw a black Range Rover (registered to an individual
11  other than the defendants) in the Von's parking lot driving in a counter-surveillance fashion.
12  Detective Woodell saw the black Range Rover pull next to a Chrysler 300 (registered to an individual
13  other than defendants) which was parked in the lot. Officers observed Kachi and another man (who was
14  not prosecuted and is hereafter referred to as "the other man") unload bags from the black Range Rover
15  and place them into the Chrysler 300. Kachi got into the driver's seat of the Chrysler 300 and the other
16  man got into the passenger's seat. The Chrysler then proceeded eastbound on Chase.

17  Officers advised ECPD Officer R. Wining, who was in a marked unit, that it appeared that the
18  Chrysler 300 was involved in a drug transaction. Wining pulled in behind the Chrysler and, seeing no
19  vehicle registration, performed a traffic stop. The driver, defendant Michael Massood Kachi, appeared
20  nervous. The other man was the only passenger. A patdown revealed $1,020 on Kachi, which Kachi
21  said was from his liquor store business. Kachi consented to a search of the Chrysler 300. Wining found
22  two shopping bags in the trunk containing clothes but no drugs. A narcotics detector dog alerted on the
23  glove box and passenger seat but no drugs were found in the interior of the Chrysler.

24  Officer Wining asked Kachi and the other man who owned the Range Rover and the other man
25  immediately said that he owned it. The other man said the Range Rover was parked in the driveway of
26  his uncle's residence. The other man said that he did not know the address but could give Wining
27  directions. Wining asked the other man if he had the key to the Range Rover so that he could search

28

it. The other man pulled a plastic key out of his pocket, handed it to Wining and said he could search the Range Rover. Officers tried the plastic key on the Range Rover in the Von's parking lot but it did not work. Officers found a second key in the Chrysler 300's center console area and took it to the black Range Rover at the Von's. The second key opened the door to the Range Rover.

### 3. Canine Alert and Discovery of 510 Grams of Cocaine in the Black Range Rover

At approximately 9:40 p.m., Detective Guerin asked Officer Bray to perform a canine sniff of the Range Rover that was parked at the Von's parking lot at 1201 Avocado. The dog alerted on the right rear passenger and driver's doors.

A search of the Range Rover by United States Drug Enforcement Administration ("DEA") Special Agent Derek Kinninger and ECPD Detective Woodell at approximately 9:45 p.m., revealed approximately 500.1 grams (net weight) of cocaine located in a map pouch in the rear of the front passenger seat.

At approximately 9:50 p.m., Sargent Hook notified Detective Forster that he had found a large amount of cocaine in the Range Rover. Forster signaled to Officer Wining to handcuff Kachi and the other man and both were placed under arrest for the cocaine. Forster told Kachi that the cocaine in his Range Rover had been found. The other man asked what was going on. Kachi turned to the other man and said, "I had a half of brick inside my car."

At that time, Kachi signed a written consent to search his liquor store and his apartment. At the store, Officers Wining and Doyle conducted a search and found a box containing wrapping papers and aluminum containers with marijuana residue. Underneath the cash register was an unloaded .38 caliber police special. Doyle located a small quantity of marijuana (2.5 grams) in a drawer, located on a wall behind the cash register. At Kachi's residence, officers found a jar containing about 14.53 grams of marijuana.

### 4. Admissions of Kachi During Transportation to the El Cajon Police Station

At approximately 11:30 p.m., ECPD Officer M. Pollard was asked by Forster to transport Kachi and the other man to the police station. While driving to the station, the other man became very upset

that he was arrested. Kachi told the other man not to worry because he did not do anything. The other man asked Kachi what this was all about and Kachi said, "I had a half kilo of coke o.k. man." The other man said, "What? I didn't know you were into that." The other man asked Kachi, "How long have you been into it?" and Kachi replied, "Like two months, o.k., I wasn't making enough money at the liquor store and I needed some extra money." Kachi then asked Pollard if he knew why he was being arrested. Pollard replied, "No." Kachi said it was because he had half a kilo of coke, "you know 500 grams."

### 5. Kachi's Post-Miranda Statements

At approximately 11:45 p.m., at the El Cajon Police Department, Forster advised Kachi of his Miranda rights and he agreed to answer questions.

Kachi said that he was at the Von's parking lot to sell a half kilogram of cocaine to Frank that night. Kachi said that Frank called him while he was parked waiting in the Von's parking lot and cancelled the cocaine deal saying there was a "sting" in progress at the parking lot and to get out of there. Kachi said he parked his black Range Rover containing the cocaine because of Frank's call about the sting operation. Kachi said he called his friend, the other man, to go smoke some weed and get something to eat. Kachi said he drove the Chrysler 300 because the other man did not have a license.

Kachi said that he usually sold Frank a kilogram of cocaine each week for which Frank always paid cash. Kachi said that on one occasion, he ordered up to four kilograms of cocaine from Frank and paid him $80,000. Kachi said that Frank had a young kid who was a "runner" for Frank.

Kachi said he felt like Frank set him up to get busted because he had just sold Frank a kilo of cocaine the day before. Kachi said that he charges Frank $15,500 for a kilo of cocaine and that Frank had paid him for the cocaine the previous day. Kachi said he is suspicious of Frank because Frank never calls back the next day asking for more cocaine.

Kachi said, among other things, that he sold cocaine because the liquor store he owned was not doing so well.

//
//

//

**6.    May 16, 2008 Undercover Buy from Frank Bertolino**

On May 16, 2008, at approximately 8:10 p.m., Bates called Frank and requested two ounces of cocaine. At approximately 9:23 p.m., Bates placed a recorded call to Frank and changed the order to one ounce of cocaine. Bates and Frank agreed to meet in 15 minutes.

At approximately 9:43 p.m., Frank arrived at the 7-Eleven as a passenger in a white Acura Integra driven by his brother, Dominick. Bates walked to the driver's side of the Acura. Frank said they needed to make it quick because there were cops all around. Bates reached across Dominick and handed Frank $600. Frank then handed an ounce of cocaine to Bates.

**7.    Arrest of Frank and Dominick Bertolino**

On May 30, 2008, at about 5:20 p.m., ECPD Officers K. McArthur and J. Cutting stopped Frank, who was a passenger in a BMW driven by Frank's girlfriend, at the Von's parking lot located on Avocado and Chase. At the time of his arrest, Frank was wearing a diamond-studded gold necklace with diamond pendant and two diamond-studded watches with estimated values of $43,000 and $9,000 respectively (one on each wrist). Agent Kinninger told Frank that he was under arrest and that they would be going back to Bertolino's residence to execute a search warrant. Frank made several statements including saying that he no longer dealt in drugs.

On May 30, 2008, at about 5:40 p.m., Sheriff's officers stopped Dominick driving a white Acura Integra on Golf Drive near his Spring Valley address.

At approximately 11:45 p.m., Agent Kinninger advised Frank of his Miranda rights. Frank waived his rights and agreed to make a statement. Frank told Kinninger he had stopped dealing drugs three months earlier. Frank denied delivering any drugs to undercover detective Bates, even after Bates came into the room and confronted Frank.

Frank said he was getting his drugs from a certain individual and that this individual might be getting his drugs from "Mike, a Chaldean."

Frank said that he earned money by selling things at a swap meet. Frank said that his girlfriend's parents were very wealthy and that her parents and his own parents took care of him.

At approximately 10:30 p.m., Kinninger advised Dominick of his <u>Miranda</u> rights and Dominick agreed to be interviewed.

Dominick said that he would deliver cocaine on behalf of his brother Frank at times. Frank provided him with a place to live and bought him food and occasionally clothes. Dominick said Frank did not pay him to do any of the deliveries. Dominick said he would deliver for Frank when Frank was busy.

Dominick said his last job was working as a mortgage consultant for his stepfather out of his stepfather's home two years ago. Dominick said that he occasionally sold car parts on Craig's List. Dominick said both of his parents had worked for the Social Security Administration for 30 years.

### 8. **Search Warrant at the Bertolino Residence in El Cajon**

Agents executed a search warrant at the Bertolino residence in El Cajon, Califonria. No narcotics or weapons were found. A computer, four cell phones, and $1,300 in cash belonging to Frank were seized, as was Frank's expensive watches and necklace. Agents also seized a $55,000 cashier's check from Frank's girlfriend which was issued by another person.

### 9. **Consent Search at Dominick Bertolino's Spring Valley Apartment**

Dominick consented to a search of his bedroom at his Spring Valley residence where agents seized a pound of marijuana and $8,000 in cash. Dominick said he sold marijuana to his friends and that the $8,000 was savings.

### 10. **Seizure of 2006 BMW 650 Registered to Dominick**

DEA seized a 2006 BMW 645 CI convertible registered to Dominick which had been moved on May 23 to Frank's girlfriend's parents' house by Frank and Amanda prior to the arrest of Dominick and Frank. The vehicle was sold in October 2007 for $89,994 and has a current value of $55,500. The vehicle is paid off.[1]

---

[1] There were three other vehicles found at the 1140 Monterey Drive residence which DEA did not seize because more was owed on the vehicles than the current value. Those vehicles are a 2006 Range Rover (registered to Dominick), a 2005 BMW 645 coupe (registered to Dominick) and a 2004 BMW 745 LI sedan (registered to Frank).

# II

# **MEMORANDUM OF POINTS AND AUTHORITIES**

## A.   **DEFENDANT'S DISCOVERY REQUESTS**

As of this writing, the Government had produced reports relating to the investigation and arrest of the defendants, as well as recordings of undercover meetings that took place in this case[2].

The following is the Government's response to defendant's discovery requests:

### 1.   **Statements of Defendant**

The Government has complied with Federal Rule of Criminal Procedure 16(a)(1)(A) and (B) by providing defendant statements. The Government has turned over audio recordings of the undercover meetings that took place in this case.

### 2.   **Arrest Reports, Search Warrants, Notes**

The Government has produced in discovery copies of the search warrant and affidavit in this case. (See Dominick Bertolino's Motion at p. 1.)

The Government has provided the defendants with investigative and arrest reports. Relevant oral statements of the defendant are included in the reports and materials already provided. Defendant is not entitled to "all reports" by investigative agents, however, but rather is entitled to those reports which are required to be produced under Rule 16, the Jencks Act, or are otherwise discoverable by law. (See Dominick Bertolino's motion at p. 1.)

Agent rough notes, if any exist, will be preserved, but they will not be produced as part of Rule 16 discovery. Defendant Dominick Bertolino's request for "raw notes made by the assistant United States attorney and/or investigative officers of all witnesses interviews" must be denied. (See Dominick Bertolino's motion at pp. 6-7.) A defendant is not entitled to rough notes because they are not "statements" within the meaning of the Jencks Act unless they comprise both a substantially verbatim narrative of a witness' assertions and they have been approved or adopted by the witness.

---

[2]   Approximately 261 pages of discovery have been produced along with approximately 20 CD-ROMs.

United States v. Bobadilla-Lopez, 954 F.2d 519 (9th Cir. 1992); United States v. Spencer, 618 F.2d 605 (9th Cir. 1980); see also United States v. Griffin, 659 F.2d 932 (9th Cir. 1981).

### 3. Brady Material/information Material to Sentence

The Government will comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963) in providing information material to guilt or punishment.

### 4. Defendants' Prior Criminal Records

The Government will provide defendants with any known criminal records.

### 5. 404(b) Evidence

The Government will disclose 404(b) evidence, if any.

### 6. Evidence Seized

The Government will comply with Federal Rule of Criminal Procedure 16(a)(1)(E) in allowing defendants an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within the possession, custody or control of the Government, and which is material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at trial, or were obtained from or belong to the defendants, including photographs.

The Government, however, need not produce rebuttal evidence in advance of trial. United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984), cert. denied, 474 U.S. 953 (1985).

### 7. Preservation of Evidence

The Government will preserve the evidence in this case. Because the bulk narcotics evidence is typically destroyed within a 60-day period, defense counsel should undertake any inspection of the narcotics authorized by the Court without delay.

### 8. Tangible Evidence

The Government will comply with Fed.R.Crim.P. 16(a)(1)(C) in providing defendants an opportunity to inspect and copy the evidence.

### 9. Evidence of Bias or Motive to Lie

The Government will comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972). The Government knows of no bias, prejudice or other

motivation to testify falsely or impairments of its witnesses, but will make appropriate disclosures if such information should become known. See Napue v. Illinois, 360 U.S. 264 (1959); Mooney v. Holohan, 294 U.S. 103 (1935).

### 10. **Impeachment Evidence**

As noted above, the Government will comply with its obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972).

However, under Brady v. Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976), the Government must only disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment. See also United States v. Gardner, 611 F.2d 770, 774 (9th Cir. 1980).

Under Brady, the suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or innocence. United States v. Bagley, 473 U.S. 667 (1985). Favorable evidence includes impeachment evidence. United States v. Bagley, 473 U.S. 667 (1985).

Defendants are not entitled to all evidence which is or may be favorable to the accused or which pertains to the credibility of the Government's case. As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980):

> [I]n response to a request for exculpatory evidence the prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality.

Id. at 774-775.

Although the Government will provide conviction records, if any, which could be used to impeach a witness, the Government is under no obligation to turn over the criminal records of all witnesses. United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976), cert. denied, 429 U.S. 1074 (1977). When disclosing such information, disclosure need only extend to witnesses the Government intends to call in its case-in-chief. United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d 1305, 1309 (9th Cir. 1979).

The Government will turn over evidence within its possession which could be used to properly impeach a witness who has been called to testify. Defendants are not entitled, however, to any and all evidence that a prospective witness is under investigation by federal, state or local authorities for misconduct.

### 11. Witness Addresses

There is no requirement that the Government provide a defendant in a non-capital case with a list of witnesses it expects to call at the trial or their statements, and defendant's motion for such a list should be denied.

In United States v. Jones, 612 F.2d 453 (9th Cir. 1979), cert. denied, 455 U.S. 966 (1980), the Ninth Circuit stated:

> The trial court correctly ruled that the defense had no right to pretrial discovery of information regarding informants and prospective government witnesses under the Federal Rules of Criminal Procedure, the Jencks Act, 18 U.S.C. Section 3500, or Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

### 12. Name of Witnesses Favorable to Defendant/material Witness

The Government knows of no witnesses favorable to the defense. The Government will provide defendant the name of any such witnesses should they become known to the government.

### 13. Statements Relevant to Defense

The Government will provide defendant with statements relevant to the defense.

### 14. Jencks Act Material

The Government will comply with its obligations pursuant to the Jencks Act.

### 15. Giglio Information

The Government will comply with its obligations pursuant to Giglio v. United States, 405 U.S. 150 (1972).

### 16. Scientific Tests/Expert Summaries

The Government will comply with Rule 16(a)(1)(F) in providing reports of tests and examinations and summaries of expert testimony, if any pursuant to Rule 16(a)(1)(G).

### 17. Personnel Files and Related Information

Defendant Dominick Bertolino requests "disclosure of any and all personnel files for persons to be called as Government witnesses, informants in this case, and the defendant, together with the existence of any and all federal, state, and local government files for these individuals." Defendant further requests "identification of all official and unofficial internal affairs of public integrity or investigation files related to or connected with each witness who was, or is, a law enforcement officer." (See Dominick Bertolino motion at p. 4.) Defendant's request is made without citation to any controlling authority and must be denied. The prosecutor assigned to the case is under no obligation to personally examine the personnel files of testifying agents. United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992). Rather, the Government will comply with its obligations under United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) pursuant to established procedures. Moreover, the Government is under no obligation to review personnel files not under its control, including those of state and local police officers. United States v. Dominguez-Villa, 954 F.2d 562 (9th Cir. 1992).

The Government will comply with its discovery obligations with respect to any witness, including the confidential informant.

### 18. Expert Witnesses

The Government will comply with Rule 16(a)(1)(G) pertaining to expert witnesses.

### 19. Grand Jury Testimony

The Government opposes defendant's request for grand jury testimony, without any showing of particularized need, except to the extent such disclosure is required under the Jencks Act.

### B. LEAVE TO FILE FURTHER MOTIONS

The United States defers to the Court whether to allow the filing of further motions by defendant Dominick Bertolino.

# III

# GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY

### A. RULE 16(B)

The United States, pursuant to Rule 16 of the Federal Rules of Criminal Procedure, requests that defendant permit the United States to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which are within the possession, custody or control of defendant and which defendant intends to introduce as evidence in his case-in-chief at trial.

The United States further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of defendant, which she intends to introduce as evidence-in-chief at the trial, or which were prepared by a witness whom defendant intends to call as a witness. Because the United States will comply with defendant's request for delivery of reports of examinations, the United States is entitled to the items listed above under Rule 16(b)(1) of the Federal Rules of Criminal Procedure. The United States also requests that the Court make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the United States receives the discovery to which it is entitled.

### B. RULE 26.2

Rule 26.2 of the Federal Rules of Criminal Procedure requires the production of prior statements of all witnesses, except a statement made by defendant. This rule thus provides for the reciprocal production of Jencks statements.

The time frame established by the rule requires the statement to be provided after the witness has testified. To expedite trial proceedings, the United States hereby requests that defendant be ordered to supply all prior statements of defense witnesses by a reasonable date before trial to be set by the Court. Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and/or reports

**IV**

**CONCLUSION**

For the above stated reasons, the Government requests that the defendant's motions be denied where indicated and the Government's motion for reciprocal discovery be granted.

DATED: August 11, 2008.

                                        Respectfully submitted,

                                        KAREN P. HEWITT
                                        United States Attorney

                                        s/John R. Kraemer

                                        JOHN R. KRAEMER
                                        Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FRANK BERTOLINO III (1), )<br>DOMINICK BERTOLINO (2), )<br>MICHAEL MASSOOD KACHI (3), )<br>)<br>Defendants. )<br>_____ ) | Case No. 08CR1727-BTM<br><br><br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, JOHN R. KRAEMER, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of United States' Response and Opposition to defendant's motion for discovery together with the Government's request for reciprocal discovery by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

**Thomas B. Matthews, Esq.**

**Daniel M. Smith, Federal Defenders of San Diego, Inc.**

**Kerry Armstrong, Esq.**

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 11, 2008.

                                            s/John R. Kraemer
                                            JOHN R. KRAEMER